Filed 4/16/15  P. v. McGee CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARLO SHEREE McGEE,<br><br>    Defendant and Appellant. | G050402<br><br>(Super. Ct. No. RIF140673)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, W. Charles Morgan, Judge.  Reversed.

Geragos & Geragos and Mark J. Geragos for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Marlo Sheree McGee appeals from a judgment after a jury convicted her of second degree murder and assault resulting in the death of her one-month-old daughter Keira Stovall (Keira). McGee argues the following: (I) the trial judge committed misconduct; (II) the trial court erred in excluding evidence; (III) the trial court erred in instructing the jury; and (IV) insufficient evidence supports her murder conviction. Because we conclude the cumulative effect of the judicial misconduct and evidentiary errors requires reversal, we need not address her instructional error claim. We reverse McGee's convictions.

FACTS

McGee and Michael Stovall met in June 2006. One year later, McGee became pregnant, and they moved in together. McGee's 10-year-old-son, Daivon Cook, whose legal guardian was McGee's father, Ernest McGee (Ernest), moved in with them. Keira was born full term by cesarean section on November 16, 2007. Thirty-year-old McGee and Keira went home four days later; Keira was petite but otherwise healthy. After a doctor visit in December, McGee used a humidifier to treat Keira's congestion.

On December 15, 2007, Stovall woke up around noon. That afternoon, McGee took Cook to a family member's house and ran errands while Stovall watched Keira. When McGee returned home about 90 minutes later, Stovall left to run errands. Stovall returned home about 9:00 p.m., and he greeted McGee and Keira, who were in the master bedroom while Cook was in his bedroom. McGee ordered pizza. She ate in her room with the door closed while she watched Keira. Cook ate in his room with the door closed. Stovall was in the living room. Cook played with Keira before he went to bed; she seemed to be well. About 10:00 p.m., McGee took Methadone, Dilaudid, and Xanax to treat her leg pain caused by sickle cell beta-thalassemia (sickle cell), which she had suffered from since she was about 13 years old. About one hour later, McGee breastfed Keira. They fell asleep on the bed.

2

Sometime after midnight, Stovall got up and went into the master bedroom to use the master bathroom. Keira was crying as McGee changed her clothes. Stovall returned to the living room closing the master bedroom door behind him. He watched television and fell asleep. At some point, McGee took a second dose of Methadone and Dilaudid. McGee laid Keira in the bassinet, laid down on her bed, and fell asleep.

About 3:00 a.m., McGee shook Stovall awake and hysterically told him that Keira was not breathing. Stovall ran into the bedroom, lifted up Keira's shirt, and put his hand on her chest. Keira was warm to the touch, but she was not breathing and her heart was not beating. Stovall told McGee to call 911, which she did.

Deputy Sheriff Christopher Loucks arrived at the apartment and knocked on the door. Stovall answered the door, said his daughter was not breathing, and led him to Keira. When Loucks entered the bedroom, he saw McGee standing in the bedroom, pleading with him to help Keira because she was not breathing. Loucks looked into the crib and saw Keira lying on her back with her eyes closed. Loucks could not get a pulse, and it did not appear Keira was breathing. He picked up her limp body. He pinched her leg, but she was unresponsive. Loucks started CPR. Loucks carried Keira outside so paramedics could begin treatment immediately. Another deputy assisted Loucks with CPR until paramedics arrived.

When paramedic Aaron Duncan arrived, Keira did not have a pulse, and he performed CPR. In the ambulance, Duncan determined Keira's heart was not beating. Duncan and another paramedic performed CPR and intubated her. Duncan did not observe any injuries to Keira's head. They arrived at the hospital. Doctors pronounced Keira dead 34 minutes later; she was one month old.

At the hospital, Deputy Sheriff Paul Lonthair spoke with McGee, who drove to the hospital with Stovall and Cook. McGee told Lonthair that at about 2:00 or 2:30 a.m., she fed Keira, changed her diaper, laid her in the bassinet, and went to bed. She told him that Keira seemed to be well.

3

Deputy Sheriff John Lenton also spoke to McGee at the hospital. McGee told Lenton that she was in her bedroom with Keira while Stovall was sleeping in the living room. She told him that she fed Keira at 2:30 a.m., changed her diaper, and laid her in the bassinet on her stomach with a pacifier in her mouth. McGee went to sleep. McGee stated she woke up about 3:30 a.m. and discovered Keira was not breathing; she had the pacifier partially in her mouth but there were no other obstructions. She said Keira had not been cranky, was acting normal the previous week, and did not have a history of breathing difficulties. McGee stated she was Keira's primary caregiver and Keira had not suffered any injuries before her death. McGee said she had given birth to two children, Keira and Cook. She told Lenton that she was taking Methadone, Dilaudid, and Demerol. A little later, Lenton asked McGee whether she had another child. McGee admitted she had a third child, which she described as an "abortion." When Lenton asked her why she described her child, Darrion Cook (Darrion),[1] in that manner, McGee said she did not remember and he did not live with her.

An autopsy later revealed Keira had three impact sites to her head. She had a fracture that covered about half the length of her skull.

An information charged McGee with first degree murder (Pen. Code, § 187, subd. (a); all further statutory references are to the Pen. Code, unless otherwise indicated) (count 1), and assault on a child under eight years old resulting in death (§ 273ab). The information alleged that on October 31, 1997, McGee suffered a prior serious felony conviction (§ 667, subd. (a)), and a prior strike conviction (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)), for child abuse (§ 273a, subd. (a)).

---

[1]     His name is also spelled Darion in other parts of the record. We will refer to him as Darrion as written in McGee's probation report.

4

*Pretrial*

Before trial, the prosecutor filed the following: (1) a trial brief requesting admission of evidence pursuant to Evidence Code section 1101, subdivision (b); and (2) a motion to limit the defense expert's testimony. In the first motion, the prosecutor sought to admit evidence that in 1997 McGee was convicted of felony child abuse while personally inflicting great bodily injury causing the child to become comatose and suffer permanent paralysis. The prosecutor alleged McGee shook seven-month-old Darrion, which resulted in his severe disability, and after a jury convicted her, she served seven years in prison where she was incarcerated until 2003. The prosecutor argued the evidence was relevant to prove McGee's prior knowledge of abusive head trauma to infants, lack of misfortune or accident, and intent.

In the second motion, the prosecutor explained McGee's proposed expert, Dr. Marvin Pietruszka, would testify it was probable Keira fell from McGee's arms while McGee was severely impaired by her prescription medications and Keira's death was accidental. The prosecutor argued Pietruszka was unqualified to offer an opinion on the "cause, mechanism, and manner of . . . death" or the "conditions of the nervous system." Additionally, the prosecutor argued Pietruszka's opinions were speculative and irrelevant because there was no evidence McGee was impaired or Keira fell.

McGee filed the following: (1) a trial brief opposing the admission of evidence pursuant to Evidence Code section 1101, subdivision (b); and (2) a motion opposing the prosecutor's motion to limit her expert's testimony. In the first motion, McGee opposed admission of evidence of her prior conviction because there was no witness who could identify McGee as the perpetrator of the prior abuse, there was no common design or plan between the two cases, and the prior case was too remote in time. In the second motion, supported by a letter from Pietruszka, McGee detailed Pietruszka's education, training, and 30 years of experience and argued he was eminently qualified to offer an opinion on Keira's cause of death and the effects of McGee's medications.

5

At a pretrial hearing, the trial court ruled the prior conviction evidence was admissible in the prosecutor's case-in-chief. With respect to the prosecutor's motion regarding expert testimony, the court stated he did not think he should or could limit the expert's testimony to the extent the prosecutor requested. The court stated an expert could opine Keira died from blunt force trauma, but the court added "there is not an expert in the universe" who could testify whether her death was an accident or a crime. The court stated the experts could only testify "there are numerous ways this blunt force trauma was caused . . . ." The court ruled Pietruszka could testify and "[t]hen we have this difference of opinion possibly with experts, and that's for the trier of fact to make the determination." The court added that if evidence concerning medications "bec[ame] relevant" Pietruszka could testify concerning the medications' side effects on an individual generally but not on a specific occasion.

*Trial*

*Prosecution's Witnesses*

Stovall testified McGee's pregnancy was high risk. Stovall stated that when McGee ran errands and he watched Keira, she seemed "normal." When asked, he agreed Keira had a "good set of lungs" and a "unique" cry. He explained that when he got up to use the bathroom, Keira was fussy and crying.

On cross-examination, Stovall stated McGee cared for Keira properly the day she died. He added that she was a loving mother to Keira and Cook. He never saw her do anything inappropriate with Keira. He explained that Keira was crying when McGee changed her because she did not like to be changed, and he did not witness McGee do anything odd. Although both he and McGee were watching their respective televisions, Stovall did not hear Keira cry or any other noises after he left the bedroom. After his recollection was refreshed, Stovall testified McGee told him that she bumped Keira's head while bathing her. On redirect examination, after his recollection was refreshed, Stovall stated that on December 17 he told detectives that Keira did not hit her

6

head and she had never been dropped. Stovall admitted that after McGee was incarcerated, she told him that she bumped Keira's head on the bathtub. After Stovall testified he did not hurt or kill Keira on redirect examination, he also stated he did not observe McGee hurt or kill Keira.

Cook, who was 15 years old at trial, testified that immediately after Keira died, McGee told him not to worry because she wanted to have another baby. Cook said he interpreted this comment as her attempt to comfort him. On cross-examination, Cook testified he lived with McGee from first to fifth grade. The following colloquy occurred:

"[Defense counsel]: What type of mom was she to you, sir?

"[Prosecutor]: Objection. Relevance.

"[Trial court]: Sustained.

"[Defense counsel]: Was your mom ever abusive to you?

"[Prosecutor]: Objection. Relevance.

"[Trial court]: Sustained.

"[Defense counsel]: Has your mom ever hit you?

"[Prosecutor]: Objection. Relevance.

"[Trial court]: If you all will approach.

"(Discussion held at sidebar, off the record.)

"[Trial court]: All right. Next question, please."

Cook testified that when he lived with McGee she treated him and Keira well and she was nice to both of them. Ernest testified McGee did not tell him about any injuries Keira suffered before her death.

The parties stipulated to the following: On September 5, 1997, McGee was convicted of willfully causing a child's life to be endangered under circumstances likely to cause great bodily harm (§ 273a, subd. (a)), while personally inflicting great bodily injury causing the child to become comatose and suffer permanent paralysis (§ 12022.7, subd. (b)).

7

Dr. Karen Winston, a pediatrician, testified Keira did not have any medical issues when she was born. Winston stated there were no abnormalities in her blood work or her neurology. She described Keira as a "term, active, stable newborn[]" who was petite because McGee smoked.

The prosecutor offered the testimony of Dr. Clare Sheridan, a forensic pediatrician, who also testified at McGee's 1997 trial. She testified concerning child head trauma, specifically shaken baby syndrome, which is also called acceleration-deceleration injury. She explained that in 1996 she examined seven-month-old Darrion, who was comatose and intubated. She stated Darrion was posturing, which indicated he had suffered a brain injury. She said he had a shunt in his head and he suffered seizures and subdural and retinal hemorrhaging. She explained his injuries were severe and were likely caused by acceleration-deceleration trauma. She stated he was spastic, could not communicate, could not feed himself, and was dependent on others for all his care. On cross-examination, Sheridan stated that in her over 20-year practice it was common for a child to suffer a skull fracture after falling from a bed. On redirect examination, Sheridan said she had seen a child die after falling off a bunk bed.

Dr. Aaron Gleckman, the pathologist who performed Keira's autopsy, testified concerning his education, training, and experience. Gleckman stated X-rays revealed Keira had no body fractures or body trauma. His external examination revealed no visible trauma to her head or body other than a scratch to the bridge of her nose. His internal examination revealed no trauma to the chest, neck, back, abdomen, or pelvis, and no natural diseases. He explained a baby's skull is elastic and consequently it takes more force to fracture a baby's skull than an adult's skull, which is more brittle.

Based on his examination, Gleckman discovered "at least three, areas of distinct impact sites[]" on her head. He stated this meant her head was "most likely" slammed against an object three times, which caused bleeding throughout the head, including epidural bleeding. He said there was a two-and-one-quarter-long fracture that

8

covered about half the left side of her head. He opined it would take "a lot for force" to create these injuries. Gleckman explained one of the impact points showed fresh bleeding, and two showed fresh and old bleeding. He stated the latter two injuries were a couple days to a week old. He opined the lack of brain swelling indicated she died "pretty quickly" after having suffered the injuries, which he described as "massive head trauma" caused by intentional acts. He explained she would have been unconscious within seconds or minutes of the injuries and dead within minutes and she could not have eaten after the injuries. He opined she died from blunt force head trauma. Gleckman did not think the massive head trauma could have been caused by bumping her head against the wall, bumping her head against a baby carrier handle, or being dropped. He said those incidents would not have caused the "huge amount of trauma" Keira suffered as a result of a "great deal of force." During direct examination, he repeated three times someone caused Keira's injuries "intentional[ly]." Defense counsel did not object.

On cross-examination, Gleckman testified Keira suffered a simple linear fracture. Gleckman opined one blow could have caused all three injuries to Keira. When defense counsel asked whether dropping an infant in a bathtub could cause a subgaleal hemorrhage, the trial court sustained the prosecutor's relevance objection. Gleckman agreed one fracture could result from dropping a child from a specified height onto a hard surface. Counsel questioned Gleckman about whether Keira had any type of disease.

"[Defense counsel]: Now, sir, throughout sections of many blood vessels, there were what is called erythrocytes having a sickle cell appearance. Is that correct?

"[Prosecutor]: Objection. Relevance.

"[Trial court]: Sustained.

"[Defense counsel]: Sir, you mentioned before that the child had no diseases. Do you recall that?

"[Gleckman]: No diseases that I found, that's correct.

9

"[Defense counsel]:  If in fact cells are located that has [*sic*] a sickle cell appearance, would that cause you to believe that the child has suffered or had some type of disease?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Overruled.

"[Gleckman]:  Well, I didn't observe that.  I have a differing opinion.  I'm not sure if your question is hypothetical or particular to this case.

"[Defense counsel]:  Well, sir, there was a neuropathology report that was authored by Dr. Erlich.  Is that correct?

"[Gleckman]:  Correct.

"[Defense counsel]:  You did read that report.  Correct?

"[Gleckman]:  Yes.

"[Defense counsel]:  She noted that there were cells that had the sickle cell appearance.  Is that correct?

"[Gleckman]:  She noted that, yes.

"[Defense counsel]:  Doctor, what is sickle cell?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained."

On redirect examination, the prosecutor asked, "And in Keira['s] . . . case, is there any chance, any possibility that this was an accidental trauma that caused her death?"  Gleckman answered, "No."  The trial court overruled defense counsel's asked and answered objection.

*Defense's Witnesses*

Defense counsel gave his opening statement before the presentation of the defense's witnesses.  Counsel stated McGee had a painful genetic disorder that required her to take heavy medications.  Counsel said the evidence would demonstrate the medications caused McGee to be unsteady, unconscious, and unintelligible.  He added an

expert toxicologist would testify concerning the medications' side effects. Counsel concluded the expert would testify Keira's injuries were consistent with an accident.

McGee testified her pregnancy was high risk because she had a blood disorder, sickle cell beta-thalassemia, which caused her excruciating and debilitating pain. She was hospitalized four or five times during her pregnancy and was prescribed Methadone and Dilaudid. She said that after Keira was born, she was prescribed Methadone, Dilaudid, and Xanax, which made her drowsy, forgetful, and relaxed. She explained that on the night Keira died, she took all three medications about 10:00 p.m., and because her legs hurt she took Methadone and Dilaudid again about 1:30 a.m. She ordered pizza because she could not stand and cook—her legs hurt and she did not feel well. She said Keira fell asleep on the bed about 11:00 p.m. As she changed Keira's diaper and clothes, Stovall walked through the bedroom to use the restroom, and he kissed Keira. After he returned to the living room, she laid Keira in the bassinet. McGee stated that after she woke up, she checked on Keira and she was not breathing. She put Keira down and got Stovall, who saw Keira was not breathing and told her to call 911.

McGee explained that before December 2007, there were two incidents where Keira injured her head. The first time, McGee was giving Keira a bath and when she laid her on the counter, Keira lifted her head and bumped it on the counter. The second time, McGee held Keira while she walked and as she turned the corner, she bumped her head against the wall. McGee admitted she was convicted of abusing Darrion but insisted she did not shake him. McGee stated Keira did nothing to make her lose control and her crying did not irritate her. She denied ever hitting or harming Keira.

On cross-examination, McGee testified her doctor told her she could breastfeed despite the fact she was taking medication but she had to wean Keira off breast milk because of her medications, which caused Keira to become exhausted. She agreed Keira lost 5.5 percent of her weight after she was released from the hospital. McGee did not know how Keira fractured her skull. She said she took a second dose of her pain

11

medications "[b]ecause maybe they weren't working." She stated she got up to check on Keira because she thought she might be hungry. On redirect examination, McGee testified she told Stovall that Keira cried more than her sons cried.

Stovall testified that after Keira was born he saw McGee take medications. He said the medications caused her to fall asleep and lose her balance. On cross-examination, Stovall admitted he did not observe McGee suffer from these symptoms the night Keira died. But Stovall added he did not see McGee from about 1:15 a.m., to 3:00 a.m., when she woke him up.

Gloria Richard, McGee's aunt, testified McGee was happy during her pregnancy and after Keira was born, she was a loving, caring, and attentive mother. Richard stated that during December, McGee seemed lethargic and confused. She added that McGee would babble. She said that on one occasion, McGee fell asleep during their conversation and on another occasion, she fell asleep while sitting on her stairs. Richard testified McGee told her that while she was carrying Keira, she turned the corner and bumped Keira's head against the wall. Richard said she looked at Keira's head but did not see any visible injury.

Nina Higgins, McGee's long-time friend, testified McGee was ecstatic about Keira being born and she was patient, nurturing, and attentive. Higgins stated that around the time of Keira's birth, McGee complained of leg pain. She also said McGee was forgetful and she witnessed her dozing off.

Ola Bawardi, a toxicologist, testified testing revealed McGee's blood had a therapeutic level of Xanax but not Dilaudid and Keira's blood had Methadone; McGee's blood was not tested for Methadone. Ernest testified that about March 2007, McGee would "nod out" or "blank out" and in December 2007, her gait was unsteady.

Dr. Marvin Pietruszka, a pathologist, testified concerning his education, training, and experience, including with intentional and accidental head trauma.

12

Pietruszka explained children who suffer abusive head trauma will typically have scalp or facial injuries, internal injuries, retinal hemorrhages, and subdural hematomas. He added that 97 percent of the time epidural bleeds are found in accidental cases. He opined complex fractures are more commonly seen in intentional head trauma cases and linear/simple fractures are more commonly seen in accidental head trauma cases. Pietruszka stated he reviewed medical, autopsy, and toxicology reports. Pietruszka opined the two important autopsy findings were three subgaleal hemorrhages and the left parietal temporal fracture with epidural hemorrhage. With respect to the first finding, Pietruszka said not much force is required for an infant to suffer a subgaleal hemorrhage because the skull and scalp is thin—any simple hit with a hard surface, such as a crib, piece of furniture, or wall, will suffice. As to the second finding, he explained the fracture was small, not complex, and not depressed, which indicated it was caused by a "lesser degree of trauma." He added that the epidural bleed associated with the fracture was characteristic of accidental head trauma. He said the presence of iron in two of the subgaleal hemorrhages suggests there may have been bleeding days or weeks before Keira died. He also stated the fact the "'subdural surfaces [were] free of neomembranes[]'" was important because in 86 percent of abusive head trauma cases there are neomembranres. Pietruszka testified the epidural hemorrhage was thin and small, which again indicated minimal trauma.

Defense counsel questioned Pietruszka about the toxicology report. Pietruszka explained there was Methadone in Keira's blood, which suggested McGee took Methadone during the time she breastfed. He said there was also Benzodiazepine and Alprazolam in McGee's blood. He added testing revealed she had taken Demerol, Dilaudid, and Methadone. When counsel attempted to question Pietruszka about the side effects of the medications, the following colloquy occurred:

"[Defense counsel]: Doctor, are you a board-certified toxicologist?

"[Pietruszka]: Yes.

13

"[Defense counsel]:  What is Methadone?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained.

"[Defense counsel]:  Sir, you indicated that you found Methadone in [Keira's] system.

"[Pietruszka]:  Yes.

"[Defense counsel]:  Does that have any relevance in this case to you?

"[Pietruszka]:  Yes.  As I said --

"[Prosecutor]:  Objection.  No question pending.

 "[Trial court]:  Well, sustained.

"[Defense counsel]:  Sir, do you know the side effects of Methadone?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained.  [¶]  Doctor, did the Methadone in Keira's system contribute to the cause of death, her cause of death?

"[Pietruszka]:  I do not believe it did.

"[Trial court]:  Thank you.

"[Defense counsel]:  How about, sir, Alprazolam that was found in . . . McGee's toxicology reports, in your opinion did that contribute to the cause of death?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained.

"[Defense counsel]:  Sir, do you know the side effects of Alprazolam?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained.

"[Defense counsel]:  How about Dilaudid, sir, do you know the side effects of that?

"[Prosecutor]:  Objection.  Relevance.

"[Trial court]:  Sustained."

14

On cross-examination, the prosecutor questioned Pietruszka about the toxicology report. The following colloquy occurred:

"[Prosecutor]: Now, toxicology has nothing to do with the cause of death to Keira . . . . Correct?

"[Pietruszka]: Well, not necessarily. It has a lot to do in this case from the standpoint of [McGee] and how she cared for her baby.

"[Prosecutor]: I'm asking you specifically: When looking at the autopsy protocol and report, the toxicology results within Keira['s] . . . system had nothing to do with her cause of death. Correct?

"[Pietruszka]: You can't evaluate a case and result in isolation. You have to look at toxicology as it fits into the picture. I honestly believe --

"[Prosecutor]: Sir, just a few minutes ago when asked, based on the autopsy protocol, what was the cause of death, you answered head trauma. Correct?

"[Pietruszka]: Yes.

"[Prosecutor]: And when asked if Methadone specifically in Keira's system had any contribution to her cause of death, your answer was no, it did not. Correct?

"[Pietruszka]: It was Methadone in . . . McGee's system that caused --

"[Trial court]: No, thank you. You're not answering her question."

At a brief recess out of the jury's presence, defense counsel indicated he was confused because during pretrial motions, the trial court ruled that if there was evidence McGee took medications, Pietruszka could then testify as to the medications' side effects. The court said, "Then your client took the stand, which I didn't know that was going to occur." Counsel began to say there was evidence, when the court interrupted him and said the following: "What you're not understanding is your client never said that she was loopy, that she was unsteady, that she stumbled, that she -- anything. She was very specific that for that entire day that she took medication and her

15

legs hurt." When counsel said there was evidence her legs hurt and she was tired, the court said the following: "I just said her legs hurt. Absolutely. So I'm sorry. I'm sorry. I'm doing my job. I'm not going to allow this complete fabrication or potential fabrication to come into evidence."

Defense counsel inquired about the trial court's pretrial ruling concerning the scope of the doctor's testimony regarding the cause of death. After counsel stated his client was prejudiced, the court stated he would admonish the jury to not consider the court's comments. Counsel replied "the bell has been rung." When the court said neither doctor could testify as to how Keira died, counsel reminded the court Gleckman had already testified Keira's death was "without a doubt intentional blunt-force trauma" and not a "mistake." The court answered, "You have not asked him -- and I was going to ask him at the end -- I'm sorry. No one can say it's an accident or not. They can say it's trauma, what the trauma resulted in, and what was the cause of death. Thank you." The trial court denied counsel's request for a mistrial.

When cross-examination resumed, the prosecutor questioned Pietruszka about Keira's hemorrhages and their relatively small size. The following colloquy occurred:

"[Prosecutor]: We'll go through them. Do you see this one, No. 3?

"[Pietruszka]: Yes.

"[Prosecutor]: To you, is that just a small, insignificant subgaleal hemorrhage?

"[Pietruszka]: There's no question in my mind this is a serious case. But we have to understand that these are surface, scalp hemorrhages. These are not fatal hemorrhages. [¶] And we have to also understand that this is a child who comes from a mother with sickle cell disease.

"[Prosecutor]: Objection.

"[Trial court]: Yes. Sustained."

16

On redirect examination, Pietruszka testified Keira died from blunt force trauma. The trial court asked how long between the trauma and the time of death. Pietruszka answered within 30 to 45 minutes of the trauma. He said there have been cases where an infant has died after falling from just 36 inches in height.

At the conclusion of Pietruszka's testimony, the trial court stated the following: "Ladies and gentleman of the jury, I have not intended by anything I have said or anything I have done or any questions that I may have asked or any ruling that I have made to intimate or suggest what you should find the facts to be or that I believe or disbelieve any witness. If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion."

Tania Rembert, McGee's long-time friend, testified McGee appeared to be under the influence of prescription drugs and she would slur her words, pass out, and stumble in 2007. Rembert stated McGee continued to slur her words after Keira was born. She added that two days before Keira died, Rembert laid Keira in a car seat and she hit her head on the handle.

*Prosecution's Rebuttal Witness*

Dechante Manier, Stovall's sister, testified that on one occasion after Keira was born Manier was at their apartment and McGee had an "attitude." On cross-examination, Manier also stated that when McGee was pregnant she appeared to be under the influence and slurred her speech.

*Jury Instructions, Closing Argument, Jury Question & Jury Deliberations*

At a hearing, defense counsel did not request instructions on voluntary or involuntary intoxication. As relevant here, the trial court instructed the jury with the following instructions concerning count 1: (1) CALCRIM No. 500, Homicide: General Principles; (2) CALCRIM No. 510, Excusable Homicide: Accident; (3) CALCRIM No. 520, First or Second Degree Murder with Malice Aforethought; (4) CALCRIM No. 521, First Degree Murder; and (5) CALCRIM No. 580, Involuntary Manslaughter: Lesser

17

Included Offense. Additionally, the court instructed the jury with CALCRIM No. 332, Expert Witness Testimony, and CALCRIM No. 375, Evidence of Uncharged Offense to Prove Intent, Knowledge, Lack of Mistake or Accident, and Credibility.

As relevant here, the prosecutor argued McGee had one child who was in a permanent vegetative state and one that is dead. The prosecutor added no child should be afraid of their parent, unless "your mother is . . . McGee." The prosecutor said, "Lightning doesn't strike twice either[,]" and "You don't want to be her kid." The prosecutor argued McGee's story about waking up Keira to feed her and change her diaper was "utterly ridiculous." She added no mother who was exhausted and self-medicated would do such a thing. The prosecutor said McGee fabricated the injuries to Keira and "hire[d] some joke . . . Pietruszka." She argued Keira's death was not an accident and McGee was guilty of first degree murder.

Defense counsel argued the prosecutor failed to meet her burden of proof. Counsel relied on Stovall's testimony Keira seemed fine just hours before her death and neither he nor Cook heard anything in their small apartment. Counsel stated McGee suffered from a disease that caused her great pain and doctors prescribed her medications that have a "profound impact" on her. Counsel stated the medications caused McGee to fall asleep, lose her balance, and forget things. He said McGee had Xanax in her system that night, and Keira had Methadone in her system. Counsel admitted Keira died from blunt force trauma, but relying on Pietruszka's and Sheridan's testimony, he argued a fall could potentially kill a child and Keira suffered a couple injuries a week or so before she died. He concluded Keira died because of a mistake, not murder.

During rebuttal, the prosecutor contended McGee isolated herself in the bedroom and suggested Stovall did not have much access to Keira. She added, "She's really -- isolates herself because she probably is tired from all the drugs she takes. She's a lazy drug addict. I don't know how much nicer to put that." After stating how dangerous it was for McGee to breastfeed while taking medications, the prosecutor said

18

the only reason McGee's pregnancy was high risk was because of the drugs she was taking. The prosecutor asserted defense counsel's accident theory was contrary to the evidence. A little later, the prosecutor twice called McGee "a drug addict" and stated "she loves the drugs more than she loved the health of Keira." The prosecutor ended, "We can't walk in her shoes. Probably good for our kids."

During deliberations, the jury submitted a question to the trial court. Recognizing it was difficult to read, the court announced the question as follows: "Do drug ingested[2] altered the defendant's state of mind." On the record, but out of the jury's presence, the court explained it had an off-the-record discussion with counsel. The court opined it did not have a sua sponte duty to instruct on voluntary intoxication but because of the substantial testimony about McGee's medication usage the court would instruct the jury on voluntary intoxication as to counts 1 and 2. The court added it would afford counsel additional time to argue the issue. The court noted the prosecutor agreed but defense counsel objected. Counsel argued he objected because the trial court prohibited counsel from questioning Pietruszka about the medications' side effects.

The trial court stated, "I don't disagree with what you have said about . . . Pietruszka." The court said, however, the defense was accident, and that is why it did not instruct on intoxication but because the jury asked the question, the court was obligated to instruct on it. Defense counsel argued the jury was not hung and there was no legal ground for reopening argument. Counsel added, "And I'm objecting to further instructions because they're not requesting further instructions." Counsel characterized the jury's question as a "factual issue." The prosecutor stated it was her opinion the jury should have previously been instructed on intoxication but it was not her duty to request the instructions. The trial court instructed the jury with CALCRIM No. 625, "Voluntary

---

2        We are not convinced the jury question states "ingested." It could be read to be "induced," although spelled, "indused" [*sic*].

19

Intoxication," as to count 1. The court instructed the jury it could not consider evidence of voluntary intoxication as to count 2.

When defense counsel resumed argument, he argued there was evidence that when McGee took her medications, she "blacked out." The prosecutor contended there was no evidence McGee "blacked out" that night. She added McGee had therapeutic doses of Xanax and Methadone in her system, but she referred to McGee as a "drug addict." The prosecutor concluded McGee's conduct in calling 911 and at the hospital demonstrate Keira's death was not an accident or a mistake.

*Verdicts & Sentencing*

The jury acquitted McGee of first degree murder but convicted her of the lesser included offense of second degree murder and count 2. At a bifurcated bench trial, the court found true the prior felony child abuse conviction. The court sentenced McGee to 25 years to life doubled to 50 years to life on count 2. The court imposed and stayed a 30 years to life term on count 1 pursuant to section 654.

## DISCUSSION

### I. Judicial Misconduct

McGee contends the trial judge committed prejudicial misconduct. The Attorney General responds McGee forfeited review of the issue because defense counsel did not object on this ground, and alternatively the judge did not commit misconduct and assuming he did, it was not prejudicial. McGee asserts counsel's motion for a mistrial preserved the issue for review. As we explain below, we conclude the issue is preserved for review and the judge committed misconduct requiring reversal.

### A. Forfeiture

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when

20

objecting would be futile. [Citations.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*).) Although defense counsel did not object to all the alleged instances of judicial misconduct, counsel did move for a mistrial based on the trial judge's comments no expert in the world could testify Keira's death was accidental.

Additionally as in *Sturm*, "Given the evident hostility between the trial judge and defense counsel . . . , it would also be unfair to require defense counsel to choose between repeatedly provoking the trial judge into making further negative statements about defense counsel and therefore poisoning the jury against his client or, alternatively, giving up his client's ability to argue misconduct on appeal. On this record, we are convinced that any attempt by defense counsel to object to the trial court's numerous sua sponte objections and derogatory comments "would have been futile and counterproductive to his client.' [Citation.]" (*Sturm, supra,* 37 Cal.4th at p. 1237.)

We have reviewed the entire record. Nearly all the judge's derogatory comments were directed at defense counsel and Pietruszka. We have found no instance where the judge treated the prosecutor or Gleckman in such a manner. The judge's hostility towards the defense is perhaps best exemplified by his comment he was not going to allow this "complete fabrication or potential fabrication to come into evidence." As in *Sturm*, we conclude any objection would have been futile. We now address the merits of McGee's claims.

## B. Merits

"The standards of conduct to which judges are held are reflected in part in the canons of the Code of Judicial Conduct. Although these canons do not have the force of law or regulation, 'they reflect a judicial consensus regarding appropriate behavior' for California judges. [Citations.] The failure of a judge to comply with the canons 'suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.' [Citation.]" (*Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 661-662.) "A judge shall be patient, dignified, and

21

courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers and of all court staff and court personnel under the judge's direction and control." (Cal. Code Jud. Ethics, canon 3B(4).) A judge must be open-minded, temperate, impartial, courteous, and patient. (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 242, p. 294; 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial § 664, p. 1024; Rothman, Cal. Judicial Conduct Handbook (3d ed. 2007) § 2.03, pp. 40-41.)

The California Supreme Court discussed these well-established principles in *Sturm, supra,* 37 Cal.4th 1218. Relying in part on the court's 90 year-old-decision in *People v. Mahoney* (1927) 201 Cal. 618, the *Sturm* court stated: "A 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution.' [Citations.] Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.' [Citation.]" (*Sturm, supra,* 37 Cal.4th at p. 1233.)

"'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.' [Citation.] To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. [Citation.] As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective

22

ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.] [¶] Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.] A trial court commits misconduct if it '"persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge."' [Citations.]" (*Sturm, supra,* 37 Cal.4th at pp. 1237-1238.)

"'"'[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" [Citation.] We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred. [Citation.] Thus, the propriety and prejudicial effect of a particular comment are judged by both its content and the circumstances surrounding it. [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 914.)

Here, the trial judge committed misconduct when he belittled the defense's expert witness, disparaged defense counsel, vouched for the prosecution's expert witness, improperly commented on the evidence, and tried to interject humor at a crucial moment in the defense case. We will discuss each in turn. We will discuss the prejudicial effect of the judicial misconduct in section III.

1. *Belittled the Defense's Expert Witness*

In *Sturm*, the judicial misconduct occurred during retrial of the penalty phase of a capital case. (*Sturm, supra,* 37 Cal.4th at p. 1244.) During voir dire, the trial judge twice stated premeditation was a "gimme." (*Id.* at p. 1231.) Additionally, defendant presented evidence his long-term cocaine addiction and abusive childhood

23

were mitigating factors in determining whether to impose the death penalty. (*Id.* at pp. 1228-1230.) The defense expert on pharmacology testified he received millions of dollars in federal grants to study cocaine abuse when the judge interrupted and stated, "'[i]n other words, you contributed to the federal deficit; is that correct?'" (*Id.* at p. 1233.) The California Supreme Court found the judge's comment disconcerting because it "conveyed to the jury that the trial judge did not take seriously the defense theory in mitigation." (*Id.* at p. 1238.)

The defense expert psychologist testified concerning behaviors in defendant's family when the judge, without a prosecution objection, interrupted and told the expert she used too many descriptive words and embellished her testimony. (*Sturm, supra,* 37 Cal.4th at pp. 1233-1234.) When the expert psychologist began to testify defendant's school records indicated his depression, the judge stated, "'What's the difference if she did or she didn't?'" (*Id.* at p. 1234.) Defense counsel asked the psychologist the effect of positive reinforcement on defendant, the prosecutor objected, and the judge ruled it would not allow evidence concerning the failure of positive reinforcement to cure defendant because "'[i]t didn't, so why do we care? Isn't that the bottom line? I assume because he didn't get it [positive reinforcement] from the father figure or something. Really, where do we go?'" (*Ibid.*) Finally, on two occasions the judge answered for the psychologist. (*Ibid.*)

The *Sturm* court concluded the judge's comments were misconduct. The court stated the judge's statement premeditation was a "gimme" was error because it was related to the key issue, undermined the defense's strategy, and bolstered the prosecution's case. (*Sturm, supra,* 37 Cal.4th at p. 1232.) The court explained the judge's comment the psychologist embellished her testimony conveyed to the jury that the judge questioned the defense expert's reliability and suggested her testimony was not based wholly on the facts. (*Id.* at pp. 1238-1239.) The court opined, "[I]t was improper for the judge to rebuke an expert witness in front of the jury by suggesting that she was

manufacturing or improperly including the descriptive details of her testimony." (*Id*. at p. 1239.) The court added the judge's comments concerning what "difference" it made and why do we "care" conveyed to the jury the judge's opinion the psychologist's testimony was "of little consequence," "useless," and "not worth considering." (*Ibid*.) The court said the judge overstepped when he answered for the psychologist and conveyed to the jury "the message that the questions were so trivial and/or obvious that he himself was able to answer them without possessing the particular expertise of the witness." (*Ibid*.) The court concluded, "The trial judge's behavior towards the two key expert witnesses for the defense conveyed to the jury disdain for the witnesses and their testimony and therefore constituted misconduct. [Citation.] . . . Such behavior, especially considered in the aggregate, conveyed to the jury the unfortunate message that the trial judge did not take seriously the testimony of the defense experts." (*Id*. at p. 1240.)

Here, defense counsel asked Pietruszka if he formed a conclusion after examining all the reports in this case. The following colloquy occurred:

"[Pietruszka]: Yes.

"[Defense counsel]: What was your conclusion that you reached, Doctor?

"[Trial court]: No, thank you. You ask a specific question. [¶] Doctor, in your opinion, after examining what you have examined, and what you have told us, could you please tell us the cause of death.

"[Pietruszka]: The cause of death is an accidental fall.

"[Trial court]: No, thank you. No, thank you. There's nobody on earth can say that. What was the cause of death?

"[Pietruszka]: Head trauma.

"[Trial court]: Thank you, sir.

"[Defense counsel]: And explaining this head trauma, sir, in your opinion, can you distinguish between whether it was accidental or abusive head trauma?

"[Pietruszka]: Yes.

25

"[Defense counsel]: What factors did you look at, sir, in your analysis?

"[Pietruszka]: I took into consideration the setting in which this child suffered this fracture. I took into consideration the fact that the mother was taking medications that could make her unstable, fidgety.

"[Prosecutor]: Objection. Relevance.

"[Trial court]: No. It's lack of foundation. Sustained.

"[Defense counsel]: Sir, did you have any knowledge that mom was taking medications?

"[Prosecution]: Objection. Relevance.

"[Trial court]: Sustained.

"[Defense counsel]: How about the physical autopsy itself, sir, that is, the injuries, did you take that into account?

"[Pietruszka]: Yes.

"[Defense counsel]: And which factors, sir, that you had mentioned previously that you took into account when you were determining whether or not this is accidental or abusive head trauma?

"[Pietruszka]: I took into account that there were -- I determined that it was accidental based on the following information.

"[Trial court]: No, thank you. Lack of foundation. Doctor, there's nobody on this planet who can say whether or not the trauma was accidental or abuse. You can't. There's trauma to the head. How was that conducted, you would have to be given a hypothetical of what actually happened just before the trauma, would you not?

"[Pietruszka]: Well, I'm going off of the statistics.

"[Trial court]: No, you're not.

"[Pietruszka]: And the documents.

"[Trial court]: There's nobody -- No, they can't.

"[Pietruszka]: I will share with you this paper if you --

26

"[Trial court]:  No, thank you.  No.  You may proffer a hypothetical, sir, that conforms with the facts.

"[Defense counsel]:  Doctor, if a mother was taking methadone --

"[Trial court]:  No, thank you.  [¶]  If a mother holding an infant of two weeks in her arms was walking at a normal speed in a room, turned the corner and hit the wall with the child's head, the top part of the child's head as she rounded the corner, and the baby cried or fussed for a very short period of time without any other symptomatology and did not show any signs, eyes or on the surface of the skull, and then two weeks later died of these injuries described in the autopsy, could that have been the cause of death?

"[Pietruszka]:  No.

"[Trial court]:  Any other hypothetical conforming to the facts, you may ask it, sir."

Later, during the prosecutor's cross-examination of Pietruszka, the following colloquy occurred:

"[Prosecutor]:  Sir, just a few minutes ago when asked, based on the autopsy protocol, what was the cause of death, you answered head trauma.  Correct?

"[Pietruszka]:  Yes.

"[Prosecutor]:  And when asked if Methadone . . . in Keira's system had any contribution to her cause of death, your answer was no, it did not.  Correct?

"[Pietruszka]:  It was Methadone in . . . McGee's system that caused --

"[Trial court]:  No, thank you.  You're not answering her question.

"[Pietruszka]:  Unfortunately, she's not allowing me to explain how this happened.

"[Trial court]:  Doctor, you know, I'm in charge.

"[Pietruszka]:  That's true.

27

"[Trial court]: You know that. So you're going to have to answer the question directed to you.

"[Pietruszka]: I will."

A little later, the prosecutor questioned Pietruszka concerning linear and complex fractures, and he repeated accidental fractures are linear and complex fractures are intentional. The trial court interrupted and the following colloquy occurred:

"[Trial court]: Would you say that that's a [100] percent of the time?

"[Pietruszka]: No, nothing is a [100] percent of the time.

"[Trial court]: Right. So if a child were to drop, say, from a six-foot height and strike a dowel or a chair knob, could that not cause, depending upon the height, a complex fracture?

"[Pietruszka]: Of course. Of course it could.

"[Trial court]: Yes. In that instance, if the person were to accidentally drop the child, that would cause that. Correct? It would not cause a linear.

"[Pietruszka]: It depends on the height.

"[Trial court]: Sure it does. I agree. But my point is -- No."

The trial judge belittled and discredited Pietruszka, the defense's key witness, when in the jury's presence he repeatedly told Pietruszka there was nobody on this "earth" or "planet" who could say Keira's death was accidental. Although the judge may have intended to say no expert could testify as to the *manner* of death, given the judge's general hostility toward the defense, it is far more probable the jury interpreted the judge's statement to mean no juror could reasonably conclude her death was accidental. This is especially true given the fact the prosecution's expert had been allowed to testify her death was intentional. The judge's comment, like the judge's comment in *Sturm*, undermined the defense offered on the pivotal issue in the case and thereby bolstered the prosecution's version of events. (*Sturm, supra,* 37 Cal.4th at p. 1238.) The judge's error was compounded by the fact the judge allowed the prosecutor's

28

expert witness to testify repeatedly and unequivocally Keira's death was the result of an intentional act.

Additionally, when Pietruszka tried to explain he based his opinion on statistics, the trial judge said, "No, you're not[]" and "There's nobody -- No, they can't." Similar to *Sturm*, the judge's comments conveyed the message to the jury the judge thought Pietruszka's testimony was "of little consequence," "useless," and "not worth considering." (*Sturm, supra,* 37 Cal.4th at p. 1239.) The judge essentially confronted Pietruszka in the jury's presence and told him he was wrong, conveying to the jury the message his testimony was of little, if any, value. If the judge believed Pietruszka's testimony to be legally irrelevant, the judge could have excluded it on that ground without belittling the defense's key witness in the jury's presence.

When the prosecutor cross-examined Pietruszka about whether all accidental fractures are linear fractures, the trial judge interrupted and questioned Pietruszka. When Pietruszka stated a fall could result in a complex fracture depending on the height from which the child fell, the judge said, "Sure it does. I agree. But my point is -- No." Again as in *Sturm*, the judge's conduct of interrupting Pietruszka and answering the prosecutor's question conveyed to the jury the judge was able to answer as an expert without possessing any special expertise, thereby overstepping the proper role of the court. (*Sturm, supra,* 37 Cal.4th at p. 1239.)

Finally, when Pietruszka stated the prosecutor was not allowing him to explain how Methadone in McGee's system contributed to Keira's cause of death, the trial judge told him, "Doctor, you know, I'm in charge." The judge could have simply advised Pietruszka to answer the prosecutor's questions and obey the judge's rulings or could have excused the jury and made the point to the witness in their absence. Instead, the judge suggested to the jury Pietruszka was uncooperative and the judge's comments conveyed to the jury his frustration with Pietruszka. Similar to *Sturm*, "[I]t was improper for the judge to rebuke an expert witness in front of the jury by suggesting that [the

29

expert] was manufacturing or improperly including the descriptive details of [the expert's] testimony." (*Sturm, supra,* 37 Cal.4th at p. 1239.)

2. *Disparaged Defense Counsel*

"'It is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial . . . . When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client.' [Citation.] This principle holds true in instances involving a trial judge's negative reaction to a particular question asked by defense counsel, regardless of whether the judge's ruling on the prosecutor's objection was correct; even if an evidentiary ruling is correct, 'that would not justify reprimanding defense counsel before the jury.' [Citation.]" (*Sturm, supra,* 37 Cal.4th at p. 1240.)

In *Sturm*, defense counsel questioned defendant's stepmother concerning how her sons would be affected if defendant were sentenced to death. (*Sturm, supra,* 37 Cal.4th at pp. 1234-1235.) The judge chastised counsel, telling him he had been around too long not to know that evidence was inadmissible. (*Id.* at p. 1235.) When counsel tried to question the expert psychologist about whether defendant's family praised defendant, the judge interrupted counsel and said: "'No, no, no. We are back to the same question number one again. I rule, I rule and then you go back and ask the question just a little bit different, *trying to sneak it by.* Is that the particular word I should use? Again, [counsel], please . . . . So again, admonish the jury that [counsel's] questions are not evidence, *as much as he would like them to be evidence.*'" (*Id.* at p. 1235.) Finally, the judge interposed his own objections to counsel's questions on many more occasions than he did the prosecutor's questions. (*Id.* at p. 1235.)

The *Sturm* court stated the judge's repeated and improper mistreatment of defense counsel conveyed to the jury that the judge "was allied with the prosecution" and implied counsel was deliberately trying to place inadmissible evidence in front of the jury. (*Sturm, supra,* 37 Cal.4th at p. 1240.) The court added the judge's negative

30

remarks about counsel were exacerbated by the judge's unequal treatment of counsel and the prosecutor. (*Id.* at p. 1241.) Finally, the court added the fact the judge intervened when the prosecutor did not, "implied that such interventions were made in the prosecutor's stead," which "strengthen[ed] the impression that the trial judge was allied with the prosecution." (*Id.* at pp. 1241-1242.)

Here, on direct examination, defense counsel questioned Pietruszka about factors distinguishing accidental head trauma from intentional head trauma. The following colloquy occurred:

"[Defense counsel]: Sir, you mentioned you have to look at the trauma itself. What are you looking for regarding the trauma itself?

"[Prosecutor]: Objection.

"[Trial court]: Sustained.

"[Defense counsel]: Head trauma, sir. You mentioned head trauma factors that you look at. Are you speaking of injuries regarding the head?

"[Pietruszka]: Yes.

"[Defense counsel]: Please tell us about the factors that you look at, sir, regarding injuries to the head.

"[Prosecutor]: Objection. Vague.

"[Trial court]: Yes. Sustained. I don't care, and the trier of fact doesn't care. What we want to do is we want to talk about small infants.

"[Defense counsel]: Thank you, your [h]onor."

The trial judge disparaged and mistreated defense counsel. Similar to *Sturm*, the trial judge implied counsel was deliberately trying to place inadmissible evidence in front of the jury. Curiously, the judge had previously stated Pietruszka's opinion was worthless and without reasoning but then would not allow him to explain his reasoning. Instead of belittling counsel in front of the jury by telling him no one "cares," the judge could have either waited for the prosecutor to object on relevance grounds or,

31

since he felt compelled to interrupt, could have lodged his own relevance objection and directed counsel to tailor his question according to the facts or called for a sidebar. Instead, the judge improperly ridiculed counsel in the jury's presence and signaled to the jury his belief the defense was without evidentiary support.

Although trial judges may pose hypothetical questions, the manner in which the trial judge here posed hypothetical questions was troubling. The trial judge was very concerned with defense counsel tailoring his hypothetical questions to the facts of the case, yet the judge's own hypothetical questions departed from the evidence. There was nothing in evidence suggesting a child had been dropped six feet, hit a dowel or chair, and suffered a complex fracture. The hypothetical question relied on facts outside the evidence, but the hypothetical could conceivably be interpreted as the judge's attempt to attack the credibility of the defense expert. Such an attack would not be improper if the record suggested the judge approached the prosecution's expert in a similar manner. But the record does not reflect the judge intervened or interfered during the testimony of the prosecution expert. This lopsided intervention created an atmosphere of unfairness. It is misconduct when a judge intervenes in a case in a partial manner. (*Sturm, supra,* 37 Cal.4th at p. 1232 [trial court's comments on evidence must be impartial and accurate].) That the hypothetical question may have been otherwise permissible does not remedy the misconduct.

The trial judge's second hypothetical question, involving hitting his finger with a hammer, was similarly outside the evidence and improper because, as we explain below, this appeared to be an attempt to interject humor at a critical point in the defense case. The timing of this hypothetical appeared to be an effort to undermine the defense in an unfair way.

Additionally, the trial judge singled out defense counsel for reprimand on numerous occasions. For example, one we discuss below occurred during cross-examination when counsel tried to question Gleckman about a hemorrhage and the judge

32

told counsel not to challenge Gleckman on his answer because his answer was correct. The judge not only reprimanded counsel in the jury's presence, but he also intervened in a manner that created the impression he was aligned with the prosecution. (*Sturm, supra,* 37 Cal.4th at p. 1241.) Another example, one we also discuss below, is when counsel tried to cross-examine Gleckman about accidental injuries without brain trauma, and the judge first shared and then belabored the story about hitting his finger with a hammer. When counsel tried to narrow the scope of his question, the judge discussed his finger's verbal response to the injury. Again, the judge belittled counsel in front of the jury and questioned his competency.

Similar to *Sturm*, the trial judge's overt skepticism of the defense and negative remarks directed at defense counsel stood in stark contrast to his measured treatment of the prosecutor. The judge disparaged defense counsel by questioning his competency and trivializing his tactics, thereby conveying the impression he favored the prosecution. We found no instance, and the Attorney General neither in its brief nor at oral argument cites to any instance where the judge disparaged the prosecutor in a similar fashion.

3. *Vouched for the Prosecution's Expert Witness*

"'Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.' [Citations.]" (*People v. McKenzie* (1983) 34 Cal.3d 616, 626, disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) A trial judge may not vouch for the credibility of a witness. [Citations.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1206 (*Banks*).) In *Banks, supra,* 59 Cal.4th at page 1206, the victim testified defendant assaulted her, raped her in her daughter's presence, and threatened to kill her family if she testified against him. When her testimony ended, the trial judge stated, "'[m]a'am, I'm sorry this happened to you . . . .'" The *Banks* court opined the judge's comment was improper vouching because it

33

suggested her testimony was true.  The court concluded however, the court's immediate admonishment after its brief comment did not establish judicial bias.  (*Ibid*.)

Here, defense counsel questioned Gleckman about the hemorrhaging.  The following colloquy occurred:

"[Defense counsel]:  And now you have what you consider to be an acute hemorrhage.  Is that correct?

"[Gleckman]:  In three separate locations.

"[Defense counsel]:  Talking about in one location, sir, when you said it was acute, that it did not show any type of --

"[Trial court]:  No, no.  He answered that *correctly*.  Don't challenge him on that one, sir."  (Italics added.)

A little later, on redirect examination, the prosecutor questioned Gleckman about Keira's time of death, cause of death, and bleeding.  The following colloquy occurred:

"[Prosecutor]:  But do falls from short distances cause the kind of trauma that Keira . . . suffered?

"[Gleckman]:  Absolutely not.

"[Prosecutor]:  There's no question in your mind, is there?

"[Gleckman]:  None whatsoever.

"[Prosecutor]:  When asked about, can one blow cause all three of the subgaleal hemorrhages, can it?  Can one blow cause all three?

"[Gleckman]:  No.

"[Prosecutor]:  Impossible?

"[Gleckman]:  Impossible.

"[Prosecutor]:  There's no trauma to Keira's neck internally or externally.  Correct?

"[Gleckman]:  Correct.

34

"[Prosecutor]: Would you expect to find any in light of the head trauma you found inside?

"[Gleckman]: You could. But the vast majority of infants, especially since she was a very young infant, they usually die from head trauma, intentional head trauma in this case."

"[Prosecutor]: And even in the shaken baby cases where there's consistent rotational forces, do you find neck injuries in those cases?

"[Defense counsel]: Your honor, objection. Relevance.

"[Trial court]: Overruled.

"[Gleckman]: Most of the time you don't. Sometimes you can.

"[Prosecutor]: Is it rare to find it?

"[Gleckman]: Yes.

"[Prosecutor]: Why is that, if you know?

"[Gleckman]: I don't know exactly why. But you don't necessarily find bleeding in the neck muscles because usually an infant will probably be held, if they are shaken to death, held lower down on their body."

As in *Banks*, the judge vouched for Gleckman and told the jury his testimony was correct. The only conclusion the jury could draw from the judge's comment was that the judge believed Gleckman's testimony concerning hemorrhages was true. The judge blatantly vouching for Gleckman was misconduct. More troubling though is the impression the judge's comment gave when combined with the judge's treatment of Pietruszka. When viewed in their entirety, the judge's comments signaled to the jury he believed Gleckman and disbelieved Pietruszka. Although the prosecutor had not objected, the judge intervened to contradict Pietruszka's expert opinion Keira's death was an accident. In contrast, the judge remained silent when Gleckman testified Keira's death was the result of an intentional act. Thus, the judge effectively vouched for the prosecution's expert witness.

35

Additionally, the trial judge created the impression he was allied with the prosecution. A few examples illustrate this point. First, during the prosecutor's cross-examination of Pietruszka, the trial judge interrupted and questioned him with the improper hypothetical. After Pietruszka answered the type of fracture would depend on the height from which the child fell, the judge stated the following: "Sure it does. I agree. But my point is -- No." The judge in trying to make a "point" assumed the role of the prosecutor, which was improper. Second, over defense counsel's relevance objection, the trial judge allowed Gleckman to testify about shaken baby cases, which was not at issue in this case, and to speculate as to why neck injuries were not common in those cases after admitting he did not know why. Finally, the trial judge on several occasions either sustained the prosecutor's objections even though she failed to state a basis or corrected the prosecutor's objection and sustained it. "A trial judge who creates the impression that he is allied with the prosecution has engaged in improper conduct. [Citation.]" (*Sturm, supra,* 37 Cal.4th at p. 1242.)

*4. Improperly Commented on Evidence*

"Article VI, section 10 of the California Constitution provides, in pertinent part: 'The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause.' We have interpreted this provision to require that such comment '"be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power."' [Citations.] Thus, a trial court has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' [Citation.] 'We determine the propriety of judicial comment on a case-by-case basis.' [Citation.]" (*People v. Monterroso* (2004) 34 Cal.4th 743, 780.) "[T]he permissible contours of constitutionally authorized judicial comment . . . observed in . . . "[judicial] decisions

36

admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair." (*People v. Proctor* (1992) 4 Cal.4th 499, 542.)

During defense counsel's argument on voluntary intoxication, counsel began to discuss the definition of "willfully," referencing count 2, and stated there was no evidence McGee did anything "willingly or on purpose." After the prosecutor objected, the trial court reminded counsel voluntary intoxication does not apply to count 2. When counsel said he was explaining what "willfully" means, the court replied, "And you told them there's no evidence that she did anything willfully. That's not so. There's -- there is -- go ahead, sir."

The trial judge's comment on the evidence was intemperate, argumentative, and unfair when viewed in the context of the entire case. The jury had to determine whether Keira's injuries were more consistent with an accident or an intentional act. The jury could interpret the judge's comments as expressing his belief the evidence demonstrated McGee willfully killed Keira and it was not possible she died from an accidental fall. The judge's error was compounded by the fact the judge remained silent when the prosecution's expert testified Keira died as the result of an intentional act but prevented the defense's expert from testifying Keira's death was an accident. The judge's comment was not an attempt to assist the jury as the exclusive trier of fact in reaching a just verdict. Instead, the judge conveyed to the jury he disbelieved the defense and impliedly the jury should as well. The judge's comment on the evidence was improper.

5. *Apparent Attempt at Humor*

In *Sturm*, when the expert pharmacologist tried to explain why the federal government funds research on the effects of drugs on people, the trial judge interrupted and stated the following: "[T]ry and answer the question. Not whether the federal government spent millions of dollars. They spent too much already. Let's not get into that . . . . That would be very depressing and we will need cocaine.'" (*Sturm, supra,* 37

37

Cal.4th at p. 1233.) The *Sturm* court stated, "While this apparently was an attempt at humor—always a risky venture during a trial for a capital offense—this court has repeatedly stated that a trial court must avoid comments that convey to the jury the message that the judge does not believe the testimony of the witness. [Citations.]" (*Id.* at p. 1238.) The court opined the judge's statement conveyed to the jury he did not take the defense's theory of mitigation seriously. (*Ibid.*)

Here, during defense counsel's cross-examination of Gleckman, the following colloquy occurred:

"[Defense counsel]: Oftentimes, sir, throughout your career, have you seen where there has [*sic*] been injuries that has [*sic*] been accidental when also there has been no trauma to the brain?"

"[Trial court]: I have.

"[Defense counsel]: I'm sorry, your honor?

"[Trial court]: I have. Accidental injuries where there's no trauma to the brain. I've hit my finger with a hammer. Your question is: Have you seen accidental injuries that there's no trauma to the brain. Right?

"[Defense counsel]: Yes, that was my question, your honor.

"[Trial court]: If I hit my finger with a hammer, my finger is going --

"[Defense counsel]: To the head, sir.

"[Trial court]: -- my finger is going to cry out.

"[Defense counsel]: To the head, sir.

"[Gleckman]: Yes, there are accidental injuries to the head. But again, in my training and experience, it's predominantly with people who have died."

The trial judge's apparent attempt at humor was misconduct. Similar to *Sturm*, the judge essentially questioned defense counsel's competency in the jury's presence by ridiculing him about the form of his question while also apparently trying to be humorous. There was no point to be made here other than to demonstrate the

38

weakness of defense counsel's presentation.  More troubling though was the judge's attempt at humor undermined counsel's effort to elicit from the prosecution's expert there could be accidental head injuries where there was no trauma to the brain.  The judge interrupted the flow of direct examination and inappropriately interjected humor at a crucial point in the defense's case.  Again, the judge, feeling compelled to intervene, could have simply advised counsel to tailor his question but instead jokingly ridiculed counsel.  That was improper.

*II.  Evidentiary Issues*

McGee contends the trial court committed four evidentiary errors.  We agree with three of her contentions.[3]  We will discuss the prejudicial effect of these errors, and the related judicial misconduct, below in section III.

*A.  Non-abuse of Cook*

McGee argues the trial court erred by excluding Cook's anticipated testimony McGee did not abuse him when they lived together.  We agree.

"Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)  'While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense.  [Citation.]  Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.'  [Citation.]"  (*People v. Freeman* (1994) 8 Cal.4th 450, 491 (*Freeman*).)

---

[3]  We need not address McGee's claim the trial court erred in ruling Pietruszka could not testify Keira's death was accidental because as we explain above, the judge's statements were misconduct.

Here, the Attorney General does not explain with any reasoned analysis why the trial court's exclusion of Cook's anticipated testimony McGee did not abuse him when they lived together was proper. Although the Attorney General provides the legal principles concerning relevant evidence stated above, the Attorney General does not explain why this evidence was *irrelevant* but instead argues any error was harmless. As the Attorney General provides no reasoned argument the trial court acted properly in excluding this evidence, we conclude the court erred. Evidence McGee did not abuse Cook while they lived together was relevant to show McGee did not intentionally abuse her children and to lessen the impact of her prior felony child abuse conviction.

B. *Side Effects of Medications*

McGee contends the trial court erred by excluding evidence concerning the side effects of her prescription medications. Again, we agree.

Although a trial court has considerable discretion in admitting evidence (*People v. Williams* (2008) 43 Cal.4th 584, 633-634), we conclude here the trial court abused its discretion. Evidence is relevant if it tends logically, naturally, and by reasonable inference to establish a material fact, including evidence concerning the defense's theory of the case. (See *People v. Marshall* (1996) 13 Cal.4th 799, 836 [criminal defendant constitutionally entitled to offer all relevant evidence of significant probative value in defendant's favor].)

McGee's defense was Keira died accidentally. The defense's theory was McGee suffered from a painful genetic disorder that caused her to take powerful medications, which affected her stability, alertness, and memory, and Keira's death was an accident. Contrary to the trial court's conclusion, there was evidence McGee was experiencing the side effects of her medications. McGee testified that on the evening of Keira's death she was in pain and did not feel well. She said she took her medications at about 10:00 p.m. and again about 1:30 a.m. Although McGee did not testify that after she took her medications she was drowsy, forgetful, or unsteady, she did testify her

40

medications generally had these effects on her. This evidence logically, naturally, and by reasonable inference tended to establish McGee was experiencing the side effects of her medications on the night Keira died. (*Freeman, supra,* 8 Cal.4th at p. 491 [evidence relevant if it tends to prove issue before jury regardless of weight].) The court's exclusion of evidence concerning the medications' side effects was error because that evidence was relevant to the defense of accident.

The Attorney General argues the trial court properly excluded the evidence because McGee never testified she was affected by the medications, and there was no other evidence she suffered from the side effects of the medications that night. The Attorney General cites to Stovall's testimony McGee did not appear to be experiencing any effects of her medication that night and the fact she "coherently" called 911 and later spoke with police at the hospital. But McGee testified to the effects of these medications and said she had taken them that night. That was enough to put the issue into play. Arguing the court's exclusion of evidence of the side effects was proper because there was no *other* evidence of side effects begs the question and is erroneous. Thus, evidence concerning the side effects of McGee's prescription medications was relevant to her defense of accident, and the trial court erred in excluding this evidence.

## C. Sickle Cell

McGee asserts the trial court erred by excluding evidence concerning the possibility her daughter suffered from sickle cell disease, the severity of her own sickle cell condition, and the prescribed medication she took to treat the disease. The Attorney General responds McGee waived review of this issue because she did not make an offer of proof, the evidence was not relevant, and its exclusion was not prejudicial. We disagree with the Attorney General on all counts.

Although it is true that defense counsel's failure to make an offer of proof in response to the trial court's sustaining a relevance objection normally waives review of that issue (*People v. Morrison* (2004) 34 Cal.4th 698, 724; Evid. Code, § 354), there are,

of course, exceptions to that general rule. An offer of proof is unnecessary where the evidence is sought by questions asked during cross-examination (Evid. Code, § 354, subd. (c)), and an offer of proof is unnecessary when a trial court's rulings make an offer of proof futile (Evid. Code, § 354, subd. (b)). A fair reading of the record on appeal supports the conclusion both are applicable here.

First, on cross-examination defense counsel asked about the possibility Keira suffered from sickle cell disease. Counsel asked Gleckman, the prosecution expert, if throughout sections of many of Keira's blood vessels, there were erythrocytes having a sickle cell appearance. The trial court sustained the prosecutor's relevance objection. Next, counsel asked Gleckman if he had read a neuropathology report authored by Erlich. Gleckman conceded Erlich had noted Keira had cells that were sickle cell in appearance. When counsel asked Gleckman what sickle cell was, the court again sustained the prosecutor's relevance objection. As we explain anon, this evidence was relevant, and counsel was not required to make an offer of proof. (Evid. Code, § 354, subd. (c).)

Second, on cross examination the prosecutor asked Pietruszka whether Methadone found in Keira's system had contributed to her cause of death. When Pietruska attempted to explain the impact of Methadone in McGee's system, the trial judge interrupted and told Pietruska that he was not answering the prosecutor's question. It was during a side bar following this colloquy the court made its comment about not allowing "this complete or potential fabrication" to come into evidence.

The prosecutor later asked Pietruska if he considered the subgaleal hemmorages to be insignificant. Pietruska responded he did not, and explained "we also have to understand that this is a child who comes from a mother with sickle cell disease." The prosecutor objected without stating any grounds for her objection, and the court stated, "Yes. Sustained." Defense counsel is not required to make an offer of proof if such an offer would be futile. (Evid. Code, § 354, subd. (b).) Prior to this ruling, the court had made it very clear it did not believe McGee's sickle cell or her medications had

42

anything to do with Keira's death.  Considering the trial court previously had declared McGee's defense a "complete fabrication or potential fabrication," denied her mistrial motion, and had not even required grounds for the objection it sustained, an offer of proof would have been futile and might well have provoked another outburst from the judge. Accordingly, the issue is not forfeited, and we will address the merits of McGee's claim.

McGee argues evidence concerning sickle cell was relevant because it explained her condition and why it was necessary to take prescribed medications and provided the basis for claiming Keira's death was accidental.  We agree this evidence was relevant.

Evidence concerning McGee's sickle cell condition and the medications she took were relevant on the issue of premeditation and deliberation.  The evidence also would have helped the jury understand the effects of the disease, including the severity of the pain, and why McGee took so much medication.  This was particularly important because it would have rebutted the prosecutor's accusations McGee was an uncaring drug addict who cared more about drugs than her daughter.  (*Freeman, supra,* 8 Cal.4th at p. 491 [evidence relevant no matter how weak if it tends to prove issue before jury].)  The fact the jury asked about the effect of drugs on the issue of intent further demonstrates the relevance of this evidence.

*III.  Prejudice*

A criminal defendant has a due process right to an impartial trial judge under the United States and California Constitutions.  (*Bracy v. Gramley* (1997) 520 U.S. 899, 904-905; *Arizona v. Fulminante* (1991) 499 U.S. 279, 309; *People v. Freeman* (2010) 47 Cal.4th 993, 1000.)  The harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), is applicable to due process errors under the United States Constitution.  (*Arizona v. Fulminante, supra,* 499 U.S. at p. 310; *People v. Flood* (1998) 18 Cal.4th 470, 525.)  Under *Chapman, supra,* 386 U.S. at page 24, reversal is required unless a court can determine the error was

harmless beyond a reasonable doubt. However, some trial errors, such as the application of ordinary rules of evidence, do not implicate the federal Constitution and are reviewed under the reasonable-probability test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)

What is clear from this authority is that the right to an impartial judge is a constitutional right implicating due process concerns. Thus, because the trial judge's comments, and his evidentiary rulings, evidence his bias and implicate McGee's due process right to an impartial judge, we conclude the *Chapman* standard of review is applicable here.

In *Sturm*, the court addressed prejudice for judicial misconduct under standards set forth in both *Chapman, supra,* 386 U.S. 18, and *Watson, supra,* 46 Cal.2d 818. (*Sturm, supra,* 37 Cal.4th at p. 1244.) The court stated, "Although no one instance of misconduct appears to, in itself, require reversal, the cumulative effect of the trial judge's conduct requires reversal. . . . [¶] . . . 'Perhaps no one of them is important in itself but when added together their influence increases as does the size of a snowball rolling downhill.' [Citation.] The numerous instances of misconduct created an atmosphere of unfairness and were likely to have led the jury to conclude 'the trial court found the People's case against [defendant] to be strong and [defendant]'s evidence to be questionable, at best.' [Citation.] [¶] [T]he trial court interjected itself unnecessarily and inappropriately into the adversary process. Many of the trial judge's comments should have been made at sidebar, and not in front of the jury; in commenting in front of the jury, the trial judge often made comments that were unnecessary to explain his rulings from the bench, and also substantively undermined the defense theory of the case." The court added that although the judge admonished the jury not infer the judge was biased based on his comments, "it would be highly improbable that such admonishment could prevail over the manner in which the trial judge conducted himself throughout the penalty

44

phase trial. [Citations.]" (*Sturm, supra,* 37 Cal.4th at p. 1244.) The court concluded reversal was required because a death sentence was not a foregone conclusion. (*Ibid*.)

Here, as in *Sturm*, the cumulative effect of the trial judge's misconduct and the evidentiary errors requires reversal. The judge's comments cast doubt on the defense's case and continued through closing argument, conveying the impression to the jury he thought the defense's case was fabricated. One comment in particular illustrates the judge's attitude toward the defense. When defense counsel inquired why the judge would not allow Pietruszka to testify as to the side effects of McGee's medications, the judge stated: "I'm not going to allow this complete fabrication or potential fabrication to come into evidence." Although the judge said this outside the jury's presence, his animosity towards the defense manifested itself throughout the trial in numerous comments. We assume the trial judge may not have intended to influence the jury's verdict, but the practical effect of his comments shifted the prestige of his office behind the prosecution. As one court observed, "[I]t should be remembered as an indisputable fact that every remark made by the trial court tending to disparage either party to a cause or counsel has more or less effect upon the jury, unskilled as a rule in court proceedings and, we think it may fairly be said, ever ready to accept any intimation from the court as to what their verdict should be." (*People v. Zammora* (1944) 66 Cal.App.2d 166, 209.)

The trial judge erred in commenting on the key issue in the case during Pietruszka's testimony and erred in repeatedly belittling him in the jury's presence. The judge also erred in disparaging defense counsel in the jury's presence through his rulings and comments, including his apparent attempt to use humor. The judge's treatment of the key defense witness and counsel conveyed to the jury the judge's conviction they should reject the defense because he believed the defense was not credible. The court also erred in vouching for the key prosecution witness, Gleckman, and telling the jury there was evidence Keira's death was the result of an intentional act while at the same time chastising defense counsel for asking the same question. (*People v. Harris* (2005)

45

37 Cal.4th 310, 347 [bias where judge ""officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution""].) The judge's conduct conveyed to the jury that the judge believed the prosecution's expert witness and the prosecution's theory Keira's death was intentional.

Additionally, as in *Sturm*, the trial judge here was not even-handed in his treatment of counsel. The judge became embroiled in the trial and improperly interjected himself when instead he should have either refrained from making most of his comments or if he felt compelled to comment should have done so out of the jury's presence.

Although the trial judge admonished the jury after Pietruszka's testimony not to interpret his comments as his opinion on the facts or the believability of witnesses, a modified version of CALCRIM No. 3530, we conclude this was insufficient to cure the error. This was not the typical case where a trial judge made an isolated comment that could be cured by such an admonishment. The judge's misconduct against the defense was pervasive and concerned the critical issue in the case. "[I]t would be highly improbable that such admonishment could prevail over the manner in which the trial judge conducted himself throughout the . . . trial." (*Sturm, supra,* 37 Cal.4th at p. 1244.)

The issue was whether Keira died accidentally or intentionally. McGee's defense was Keira died accidentally, but the trial judge, through his comments, conveyed to the jury his belief that the defense case was meritless and the prosecution's case was strong. The judge's comments were particularly damaging in light of his evidentiary rulings, three of which as we discuss above were erroneous, and went to the heart of the defense. The court's exclusion of this relevant evidence hamstrung the defense.

Finally, the trial court intervened to prevent the defense's expert, Pietruszka, from testifying it was his opinion Keira's death was an accident after remaining silent when the prosecution's expert, Gleckman, testified her death was the result of an intentional act. We find telling the trial judge's comment when defense

46

counsel inquired why the court allowed Gleckman to testify as to his opinion Keira's death was intentional but did not allow Pietruszka to testify as to his opinion her death was accidental. The court stated the following: "You have not asked him -- *and I was going to ask him at the end -- I'm sorry.*" (Italics added.)

Based on the entire record, we conclude the cumulative effect of the judge's misconduct requires reversal. When considered in the aggregate, the judge's comments conveyed the impression to the jury McGee's defense was unbelievable. If the error here did not violate due process under the federal constitution, we would review McGee's claims pursuant to *Watson, supra,* 46 Cal.2d 818, and it is likely we would have reached a different conclusion. But because the error here implicates due process rights, we must apply *Chapman* and cannot conclude the error was harmless beyond a reasonable doubt.

*IV. Sufficiency of the Evidence*

On appeal, McGee argues that assuming "someone intentionally" abused Keira, there was no substantial evidence she was the perpetrator because either Stovall or Cook could have killed Keira. We disagree.

"""To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."" [Citations.] ""If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.""" [Citations.] The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez* (2004) 32 Cal. 4th 73, 104.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Second degree murder is the unlawful killing of a human being with malice aforethought that is not willful, deliberate, and premeditated. (§§ 187, subd. (a),

47

189.)  The elements of assault on a child under eight resulting in death are the following: (1) a person, having the care or custody of a child under eight; (2) assaults the child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; and (4) resulting in the child's death.  (§ 273ab.)

Here, there was sufficient evidence to establish McGee inflicted the injuries that caused Keira's death.  There was evidence from which the jury could reasonably conclude Keira was healthy until the day she died.  There was evidence Keira previously suffered bumps to her head, but Gleckman testified these minor injuries would not have caused the massive amount of head trauma required to cause her death.  In the hours leading up to Keira's death, the evidence demonstrated she was happy and healthy. When McGee went to run errands, Stovall watched Keira and she appeared to be fine. Later that night, Cook played with Keira and she appeared to be fine.

Although there was evidence Stovall entered the master bedroom sometime after midnight to use the bathroom, the evidence demonstrated McGee was alone with Keira that night and she was Keira's primary caregiver.  McGee testified she put Keira in her basinet about 1:30 a.m., and she laid down and fell asleep.  About 90 minutes later, she woke up and found Keira not breathing.  There was no evidence anyone other than McGee and Keira were in the master bedroom during that time.  There was evidence from which the jury could conclude McGee was tired and experiencing the effects of her medication, but McGee did not testify she was awakened by any sounds.  Both expert witnesses testified Keira died from blunt force trauma.  The critical issue at trial was whether her death was intentional or accidental.  Therefore, based on the entire record, we conclude there was sufficient evidence to establish McGee caused Keira's death. (*People v. Story* (2009) 45 Cal.4th 1282, 1296-1297 [where trial court admitted prosecution's evidence, whether erroneously or not, sufficient to sustain guilty verdict, Double Jeopardy Clause does not preclude retrial after reversal of guilty verdict].)

DISPOSITION

The judgment is reversed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.